# 14-2169

## United States Court of Appeals for the Second Circuit



SUNITA DESWAL, PARS SINGH,

*Plaintiffs-Appellants,*

v.

US NATIONAL ASSOCIATION, AS TRUSTEE MORGAN STANLEY
MORTGAGE LOAN TRUST 200616AX MORTGAGE PASSTHROUGH
CERTIFICATES, SERIES 200616AX, IDEAL MORTGAGE BANKERS
LTD., DBA LEND AMERICA, GENERAL MOTORS ACCEPTANCE
CORPORATION, AKA GMAC MORTGAGE, SAXON MORTGAGE
SERVICES, INC., OCWEN FINANCIAL CORPORATION,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLANT

FELTON & ASSOCIATES
*Attorneys for Plaintiffs-Appellants*
*Sunita Deswal and Pars Singh*
1371 Fulton Street, 2nd Floor
Brooklyn, New York 11216
(718) 622-1100

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ............................................................................ ii

JURISDICTIONAL STATEMENT ............................................................ 1

PRELIMINARY STATEMENT .................................................................. 1

STANDARD OF REVIEW ......................................................................... 2

STATEMENTS OF THE ISSUES ON REVIEW ........................................ 4

STATEMENT OF THE CASE .................................................................... 4

THE STATEMENT OF FACTS .................................................................. 6

POINT I
    APPELLANTS FAILURE TO SUE WITHIN THE SIX YEAR
    STATUTORY PERIODWAS NOT ATTRIBUTABLE
    TO THE ABSENCE OF DUE DILIGENCE ......................................... 11

CONCLUSION ........................................................................................ 19

# TABLE OF AUTHORITIES

*Page*

**Cases**:

*Ideal Mortgage Bankers, Ltd D/B/A Lend America,* and *Michael Howard Ashley*, Civil Action No. 09 CV 4484,  (E.D.N.Y. 2009) ........................ fn. 4

*M & T Mortgage Corporation v. Miller, et al.,*
  323 F.Supp.2d 405 (E.D.N.Y. 2004) ......................................................... 13

*Matter of MERSCORP, INC., et al. v. Romaine,*
  8  N.Y.3d 90, 861 N.E.2d 81, 828 N.Y.S.2d 266, (2006) ................... 17, 18

*Matter of Zoe G.,*
  617 N.Y.S.2d 370 ...................................................................... 16

*Pani v. Empire Blud Cross Blue Shield*,
  152 F.3d 67 (2d Cir. 1998) ................................................... fn. 4

*United States of America v. Ideal Mortgage Bankers, Ltd.*
  *d/b/a Lend America and Michael Howard Ashley*, 09 CV 4484 ................ 2

**Statutes and Regulations**:

24 C.F.R. §203.5 .................................................................... 9

12 U.S.C. §2607 .................................................................... 1
12 U.S.C. §2614 .................................................................... 1

15 U.S.C. §1601 .................................................................... 1
15 U.S.C. §1602 .................................................................... 1
15 U.S.C. §1639 .................................................................... 1
15 U.S.C. §1640 .................................................................... 1
28 U.S.C. §1331 .................................................................... 1

Federal Rules of  Civil Procedure, Rule 12(b)(6) ............................. 6
Federal Rules of  Civil Procedure, Rule 56(c) ................................. 6

National Housing Act of 1934 ............................................. fn 1, 6

## JURISDICTIONAL STATEMENT

This action was commenced in the Supreme Court of the State of New York, County of Queens on April 25, 2013. On or about June 12, 2013, Appellees removed the action to the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. §1331.

Appellants claims encompass 15 U.S.C. §1601, et seq., 15 U.S.C. §1602, 15 U.S.C. §1639, 15 U.S.C. 1640, 12 U.S.C. §§2607 et seq. and 12 U.S.C. 2614, statutes over which the District Court has original jurisdiction on the basis of federal questions of law.

This appeal is from the Memorandum and Order filed on May 14, 2014. [A217] The Notice of Appeal was served on June 13, 2014. On June 16, 2014, the Notice of Appeal was amended to include the names of both appellants.

## PRELIMINARY STATEMENT

Ideal Mortgage Bankers d/b/a Lend America was a certified participant in the loan origination program called "Direct Endorsement." The mortgage fraud, for which Lend America and its principal were sanctioned and debarred from further participation in the mortgage industry inures to the benefit of all subsequent holders of the note and mortgage to

1

the detriment of home owners whose mortgages originated with Lend America. (Joint Appendix, hereinafter "A") [See A162-A169, A170-A173]

Further, Appellees US National Association, as Trustee Morgan Stanley Mortgage Loan Trust 2006-16AX Mortgage Pass ("US National") and Ocwen Financial Corp. ("Ocwen") moved the District Court to dismiss the Complaint on the basis that the Complaint (a) failed to state a cause of action, (b) set forth "bald assertions," (c) was barred by the statute of limitations and (d) Saxon was/is not an assignee of the note and mortgage but a mere servicer the Loans.

## STANDARD OF REVIEW

De novo review is required to determine if the holders of the note and the mortgage are bound by misconduct of which Lend America and its principal Michael Ashley were convicted. The United States Department of Justice accused Lend America and Ashley of the fraudulent issuance of HUD backed mortgages to unqualified home owners whose eligibility they certified in their capacity as HUD certified Direct Endorsers. [See *United States of America v. Ideal Mortgage Bankers, Ltd. d/b/a Lend America and Michael Howard Ashley*, 09 CV 4484, A162 to A173] Lend America and Ashley could not defend against the charges. Upon default, judgments were entered.

The District Court states that "[t]his is an unusual case." [A248] This case is usual in that the Record details rather elaborate schemes employed by Lend America to conceal its misconduct from the federal government. Moreover, the documentation appearing in the Record supports the conclusion that homeowners of ordinary intelligence were unlikely to detect the deception as Lend America's primary aim was to dupe sophisticated government officials. With the "bar of deception" set so high, a lay person of ordinary intelligence would have no clue as to the fraud, the nature of the fraud, the scheme employed to perpetrate the fraud or that he or she and the government were the targets of fraud.

The Record further supports a finding that appellees' actively participated in the manipulation of mortgage documentation withholding title from the public domain. The absence of title documentation stymied appellants' ability to seek timely redress. The Record demonstrates the release into the public domain i.e., the ACRIS filing within in one month after the six-year statute of limitation lapsed. Finally, appellants had no knowledge of MERS or danger portended by MERS' designation as a nominee.

## STATEMENTS OF THE ISSUES ON REVIEW

Q.    Did the District Court err in concluding that the statute of

Statute of Limitations was not tolled?

Yes. The facts alleged sufficiently demonstrate that the New York City Automated City Register Information System (hereinafter "ACRIS") did not contain the names of the beneficial owners of Appellants' mortgages. Further, the District Court does not address the fact that MERS assigned appellants' mortgages on the sixth anniversary of the origination of the mortgages which were filed after the six-year Statute of Limitations lapsed.


Q.    Did the district court err in not considering the timeliness of the

MERS' filing of the Assignment of Mortgage?

Yes. Appellants presented a number of reliable authorities that unequivocally confirm and conclude that as between its membership, MERS controls the release of data that is released into the public domain.

## STATEMENT OF THE CASE

The District Court characterizes appellants' legal arguments as follows: "…Lend America's fraudulent behavior in executing plaintiffs' loan documents warrants tolling" and "…defendants actively concealed the owners of the loan documents by using MERS' private rerecording system, thereby preventing plaintiffs from filing a timely complaint against the proper parties." [A253]

The mortgages originated with Lend America. The facts put before the court detailed the charges and schemes used by Lend America in connection with its issuance of fraudulent origination of HUD-backed loans. The District Court did not consider the detriment to appellants, first time home owners, who placed a great deal of reliance and trust in Lend America and its principals unwittingly became the instrument of Lend America's fraudulent conduct. Thus, Lend America in targeting the federal government engaged in the concurrent victimization of unwitting first time home owners. The federal government did not know and was not aware of Lend America's sophisticated scheme. There is no reason believe that appellants had equal knowledge or sophistication in this regard.

Appellants were no match for Appellees who, for a living, actively participated in various aspects of the mortgage market. Hence, Appellees

motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a cause of action should have been denied. It was during oral argument on the motion, the District Court converted the Rule 12(b)(6) motion to a Rule 56(c) motion for summary judgment. [A244] Appellants were give a fort night to respond.

## THE STATEMENT OF FACTS

Appellants Sunita Deswal and Pars Singh were first-time, low-income homeowners.[1] The property located at 236-11 Bentley Road, Rosedale, New York, ("the Property") listed in the Office of the City Register as Block 13733, Lot 11.[2]

Ideal Mortgage Bankers d/b/a Lend America was a certified participant in the loan origination program called "Direct Endorsement." This Program was administered by the United States Department of Housing and Urban Development ("HUD"). As the participants, while certified, were "non-supervised" under the Direct Endorsement Program, HUD imposed strict compliance with its regulations governing loan origination and underwriting of FHA backed loans. [24 C.F.R. §203.5]

---

[1] Pursuant to the National Housing Act of 1934, low-income, first-time home buyers are eligible for FHA mortgages. [12 U.S.C. 1709] Lend America was authorized to originate loans to low-income, first time buyers.

[2] The City Register shows another owner of the identical Block and Lot numbers for different street addresses Block 13733, Lot 11 recorded in the chain of title. [A147]

As set forth in appellants' affidavits, the property was listed at a price of $675,000. Sunita Deswal, a tutor, had annual gross earnings of $30,000. [A175, A182] Pars Singh had no steady employment as sold sundry items at a flea market. [A175] Mr. Singh's income was sporadic and fluctuated from week to week based upon the kind of merchandise he sold and the number of sales. [A175]

Appellants saw the Property in March 2006 and closed fewer than three weeks later on April 5, 2006 without having received the obligatory notices, namely; TILA, HOEPA, RESPA. Appellant Singh avers that Lend America's representatives (Michael Parker) prepared the mortgage application for appellants' signature. [A176] Appellant avers that when he and his wife arrived at the offices of Lend America, Parker inquired about their income and they disclosed their earnings providing them with tax returns for 2003 and 2004. [A175] Parker and Primeau advised appellants that they qualified for the loan because of the rent that appellants would derive from the apartment in the house appellants sought to purchase. [A176, A177]

Appellant avers that Parker and Primeau told them that the Property had a ten-year tax abatement establish by the City of New York to encourage development in the locale and the abatement would cause a reduction in

appellants' monthly mortgage payments. [A176]  Parker advised appellants that the absence of real estate tax together with the income to be generated from the rental apartment caused them to qualify for the Loan. [A176]

Appellants never purchased or owned property before the subject purchase.  Thus, in reliance upon the representations made by Parker and Primeau, appellants signed the mortgage application that Lend America representatives prepared. [A177]

Appellants told Parker and Primeau that they were nervous about making such a huge purchase but Lend America representatives assured appellants that they qualified financially for the Loan. [A176, 177] The Lend America representatives promised to assist appellants in the buying/application process.   In furtherance of their promise to assist appellants, Parker provided them with an attorney. [A177]  Parker and Primeau introduced appellants to the lawyer who represented them at the Closing.  Appellants' lawyer advised them to sign the contract.  [A177] Appellants advised their lawyer that the loan application already had been submitted. [A177]

Lend America funded the entire purchase price of  $675,000 through first and second mortgages without an earnest money deposit.  [A184-A206] Such financing was in violation of the HUD regulations.  [See HUD

Handbook 4155.1Rev-5, Mortgage Credit Analysis for Mortgage Insurance, One to Four Family Properties, October 20, 2003]

As set forth in appellant's affidavit, Parker and Primeau continuously assured appellants that they were financially qualified to purchase the house because the rent generated by the apartment would yield ample sums, supplementing their income thus enabling them to pay the mortgage. [A177]

Based upon the HUD Handbook 4155.1Rev-5, Mortgage Credit Analysis for Mortgage Insurance, One to Four Family Properties, October 20, 2003, appellants did not qualify for mortgage loans. HUD guidelines mandated that mortgage applicants make an equity down payment as one of the requirements of qualifying for the mortgage.

The HUD Regulations required the Direct Endorser to analyze the applicants' income to determine if they were good credit risks. The required analysis included the applicants' the rent receipts, recurring bills, credit reports for derogatory statements then make a determination based upon Lend America's receipt of documentation.. [24 C.F.R. §203.5] No such documentation was requested of appellants.

Lend America funded appellants' first mortgage of $540,000 for a fixed term of thirty years. Lend America funded the second mortgage, a

9

balloon for the sum of $135,000, which provided for the payment of interest only for a term of fifteen years.[3] Appellants' closing costs were $18,500 none of which was applied to the purchase price of the Property.

Lend America's representatives advised Appellants not to worry about the high cost of the property as Lend America would assist them through the process. In reliance on those assurances, appellants signed the mortgage application. Appellant avers that the representations made by Parker and Primeau caused them to sign the mortgage but the representations were false.

The monthly mortgage installment payments exceeded their ability to pay. Appellants' monthly mortgage installment payments were approximately $6,000 per month which included real property tax and hazard insurance. [A177] Parker and Primeau misrepresented the cost of the real property tax. Appellants' property did not have tax abatement. [A177] Appellant avers that the fair market rents in the area were low and the rental unit did not yield enough income to cover the deficit left by their earnings.

Appellants aver that they and their three children; a newborn, a five and seven year old, moved into the basement/garage. [A177] Appellants attempted to rent their apartment together with the rental unit in order to

---

[3] As set forth in the Singh Affidavit, the mortgage documents he received at the Closing are inconsistent with those filed on the bank's website which show two adjustable rate Notes. [See Exhibits B, C and D of the Singh Affidavit]

10

satisfy the mortgage payments.  [A177] When living arrangement proved to be too harsh for appellants and their children, in 2009 Sunita Deswal and their children returned to India.  [A177] Mr. Singh remained in the Property, living in the basement/garage and continued to pay their mortgage through 2012 by borrowing from other creditors. Appellants utilized all credit available to them in order to consistently make monthly mortgage installment payments.

The aggregate sum of their payments exceeded $335,000. Sunita Deswal and three children returned to the Property in 2013.   [A178] Appellants and their children continue to live in the basement/garage.

## POINT I

### APPELLANTS FAILURE TO SUE WITHIN THE SIX YEAR STATUTORY PERIODWAS NOT ATTRIBUTABLE TO THE ABSENCE OF DUE DILIGENCE

The District Court could not reconcile why appellants commenced this action and seek rescission of the mortgages.  The Court states "Over the course of seven years plaintiffs invested over $300,000 in a home that they purchased in 2006.  They now claim that they are the victims of mortgage fraud." [A248, A249]

First, appellants were motivated to pay the toxic first and second mortgages based upon a sense of duty and honor.  This fact of duty and

horror is demonstrated by appellants' willingness to rent their own apartment and to undertake the move from their apartment into the basement/garage with their three infant children in an effort to garner the funds to pay their mortgage. When the coarseness of such living became too harsh for his wife and children to endure, Appellant Singh sent his wife and children back to India to assuage their suffering. Appellant Singh remained and continued to reside at the subject property under intolerable living conditions. Second, even after enduring so much hardship and privation, appellants' hung-on to their dream of home ownership relying still on the representations of Lend America employees and representatives who advised that the method of financing Lend America advocated could work. Appellants expended their best efforts to make the financing work. In order to file a claim, one must know that he has a claim to file and he must relinquish all belief in his ability to sustain the cost of carrying that home.

Lend America had full HUD-FHA approval as a Direct Endorser and advertised this approval to the public. [A171, A172, A173] The Complaint against Lend America and its principal Michael Ashley reveal that Ashley was the subject of multiple debarments and suspensions starting from 1989. [4]

---

[4]The Complaint in the action *Ideal Mortgage Bankers, Ltd D/B/A Lend America,* and *Michael Howard Ashley*, Civil Action No. 09 CV 4484, (E.D.N.Y. 2009) describes in the 155 pages defendants' fraudulent concealment of Ashley's criminal record, debarments, suspensions and convictions dating-back to 1989.

Ashley was indicted and convicted in connection with other mortgage frauds before he operated Lend America. Notwithstanding these recorded penalties and convictions, Ashley on behalf of Lend America acquired certifications from the United States Department of Housing and Urban Development that allowed Lend America to self-regulate federally backed mortgages and to flagrantly perpetuate its fraudulent conduct against innocent prospective buyers. The United States government took ten years to uncover Ashley's and Lend America's fraud. If Ashley and Lend America could dupe the United States government, appellants were unwittingly participants.

Clearly, there was an "…inequality of bargaining power, deceptive practices…and an imbalance in the understanding and acumen of the parties." *M & T Mortgage Corporation v. Miller, et al.,* 323 F.Supp.2d 405 (E.D.N.Y. 2004)

Appellants complain and their supporting documents establish the following:

    a.    Sunita Deswal, who was employed as a tutor when appellants applied for the mortgages, had an annual gross income of $30,000; [A182]

    b.    Pars Singh had no steady employment; [A182]

---

The Court may rely upon matters of public record. *Pani v. Empire Blud Cross Blue Shield*, 152 F.3d 67 (2d Cir. 1998).

c.      Lend America's representatives (Michael Parker) prepared the mortgage application for appellants' signature; [A177]

d.      Parker and Primeau advised appellants that the Property had a ten-year real property tax abatement; [A176]

e.      Parker advised appellants that the absence of the real estate tax assessment together with the income to be generated from the rental apartment would qualify them for a mortgage and they would be able to pay the mortgage; [A176, A177]

f.      Parker provided them with an attorney; [A177]

g.      Lend America funded appellants' first mortgage of $540,000 for a fixed term of thirty years. Lend America funded the second mortgage, a balloon for the sum of $135,000; [A184-206]

h.      The Loan application was submitted to HUD before the Contract of Sale was signed. [A177]

The Settlement Statement also known as the HUD Statement designates appellants' mortgages as "Conv. Unins." i.e., conventional uninsured mortgages. [A200, A201, A203, A204] This loan designation is false. The mortgages are backed by HUD. [A198]

Appellants assert that they entered into the contract of sale at the specific instance of Lend America's employee Park and Primeau a principal of Lend America and Parker provided appellants with an attorney. [A177] Although that advised their counsel that the mortgage application was signed

14

and submitted by Lend America prior to the execution of the Contract of Sale, some weeks later, appellants were not advised the legal problems that this sequence of events portended. Appellants executed the mortgage application before they signed the Contract of Sale. Lend America steered them to legal counsel who failed to advise them of the prohibition against financing one hundred per cent of the purchase price, that the Loans violated New York State Banking Laws or that they were entitled to receive TILA, RESPA and HOEPA.

Appellants provided Lend America with tax returns for 2004 and 2005 and notwithstanding their low income as first-time home buyers, Park and Primeau advised appellants that appellants qualified based upon the income to be derived from rental unit and their fabrication of a ten-year tax abatement offered by the City of New York to encourage development in the area.

The acts of misconduct set forth herein above are those which the originator and any subsequent holder would seek to disguise. Appellants assert that during the effective period of the statute of limitations, appellees had an interest in cloaking the bad deeds that under girded these mortgages originated by Lend America. It is clear that a claim based upon the doctrine of equitable estoppel must be rely on new or different acts of misconduct

that are employed to conceal the prior bad acts. *Matter of Zoe G.,* 617 N.Y.S.2d 370.

Appellee Saxon points to the publicly recorded assignment dated 08/03/2009 from MERS to Bank of America National Association as successor by merger to LaSalle Bank National Association as Trustee Morgan Stanley Mortgage Loan Trust 2006-16AX. [A61] Clearly, this purports to be an assignment of the mortgage only and not the note.

Saxon's Exhibit D, shows a "Corrective Assn" executed by MERS on January 30, 2011. Although the Assignment of Mortgage was signed on January 30, 2011, it was not "prepared for recording" in the public domain until "04-05-2012," the date on which the statute of limitations lapsed. [A63, A64] The corrected Assignment of Mortgage dated January 30, 2011 was not recorded until May 15, 2012, sixteen months after the execution and one month and ten days after the statute of limitations lapse. The District Court overlooked these facts.

In summarizing these facts, Appellants stated in their Memorandum of Law that the Assignment of Mortgage in the form of a "correction" was filed in the Office of the Register on April 5th, 2012, the date on which the six year statute of limitations lapsed. [A144] This was an error. The Assignment of Mortgage is dated *January 30, 2011*, a year and four months

before the statute of limitation expired but was withheld from the public record. The Assignment is back-dated showing an effective date of August 3, 2009 before the commencement of Lend America and Michael Ashley. Any holder of the mortgage prior to the prosecution became a "holder in due course" and could not be held liable for the bad deeds of the originator.

The "preparation date," for the Assignment to be filed is the date on which the statute of limitations lapsed. The Assignment was filed and became public record on May 15, 2012. [See A63, A64 and A163, A164] There is no way that appellants would have been able to discern or decipher these machinations. The standard imposed by the District Court is too high.

In its general course of business, "[t]he initial MERS mortgage is recorded in the County Clerk's office with 'Mortgage Electronic Registration Systems, Inc.'s named as the lender's nominee or mortgagee of record on the instrument. During the lifetime of the mortgage, the beneficial ownership interest or servicing rights may be transferred among MERS members (MERS assignments), but these assignments are not publicly recorded; instead they are tracked electronically in MERS's private system." [*Matter of MERSCORP, INC., et al. v. Romaine,* 8  N.Y.3d 90, 861 N.E.2d 81, 828 N.Y.S.2d 266, (2006)]

The MERS System inures to the benefit of its members who actually

determine and control what data will be recorded in the public domain, and when the data will be recorded, the lay public it at a substantial disadvantage and it without recourse in acquiring such data. The public does not know that these data exist. Non-members such as home owners are excluded from access but have a right to know who owns their mortgage. Home owners have no knowledge of MERS' in house maneuvering which deprives them of their right to seek legal redress.

In reviewing MERS' impact on the public recording system, the New York State Court of Appeals states, "The lack of disclosure may create substantial difficulty when a homeowner wishes to negotiate the terms of his or her mortgage or enforce a legal right against the mortgagee and is unable to learn the mortgagee's identity… [t]he MERS system will render the public record useless by masking beneficial ownership of mortgages and eliminating records of assignments altogether. Not only will this information deficit detract from the amount of public data accessible for research and monitoring of industry trends, but it may also function, perhaps unintentionally, to insulate a note holder from liability, mask lender error and hide predatory lending practices." [*In the Matter of MERSCORP, INC., et al. v. Romaine,* 8 N.Y.3d 90, 861 N.E.2d 81, 89, 828 N.Y.S.2d 266 (2006)]

Appellants were induced into purchasing the property by Lend America, its employees and representatives.   MERS prevented timely recording of mortgage documents.   The documents on which appellees rely se forth a flagrant example of fraudulent concealment. [A63, A64]   All though the Assignment was duly executed on January 30, 2011, it was not record until May 12, 2012.

Based upon the documents recorded in the public domain, appellants still cannot discern what entity owns the mortgage and the note.

## CONCLUSION

The Order should be reversed and the case remanded.

Dated:  Brooklyn, New York
        October 29, 2014

                          Respectfully submitted,


                          _____
                            Regina Felton, Esq.

19

CERTIFICATION PURSUANT TO
Fed. R. App. P. 32(a)(7)(B) and (C)

The undersigned hereby certifies that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and (C) because the brief contains 3,626 words of text.

The brief complies with the typeface requirements of Fed. R. App. P.32(a)(5) and the type style requirements of Fed.R.App.P.32(a)(6) because this brief was prepared in a proportionally spaced typeface using Microsoft Word 2007, Times New Roman, Size 14.

Dated: October 29, 2014

_____/s/_____
Regina Felton, Esq.

*db*